UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MERSEN USA – MIDLAND-MI INC.,

    Plaintiff/Counter-Defendant,

v.

GRAPHITE MACHINING SERVICES & INNOVATIONS, LLC,

    Defendant/Counter-Plaintiff,
                                     /

Case No. 12-10961
Honorable Thomas L. Ludington

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT CONCERNING BREACH OF CONTRACT CLAIMS**

    Graphite Machining Services & Innovations, LLC (GMSI) contracted with Mersen USA-Midland-MI, Inc. (Mersen) to have various graphite parts[1] purified and coated with a special chemical compound called Silicon Carbide (SiC). GMSI machined the graphite parts, Mersen purified the parts and applied a SiC coating, and GMSI paid Mersen. Then GMSI stopped paying. Mersen filed a lawsuit emphasizing that GMSI's money was overdue, and GMSI responded with a counterclaim and its assertions that Merson's product was deficient. Now at issue is which party is in breach.

    GMSI claims that Mersen did not purify and coat the graphite parts in conformity with industry standards and the parties' course of dealing. Mersen contends that no purity or performance standards were included in the parties' agreements, and that it complied with every term that the parties agreed to.

---

[1] The graphite parts were used in producing semiconductors and light-emitting diodes (LEDs), and were allegedly used in the silicon and metal organic chemical vapor deposition (MOCVD) epitaxial industries.

So the focus becomes whether additional terms—not expressed in the contracts—apply to Mersen's performance. If yes, GMSI's counterclaim lives on. If no, summary judgment is warranted on Mersen's behalf. Based on what follows, Mersen's motion for summary judgment will be denied as it relates to the remaining breach of contract claims.

**I**

The factual background of this case has been outlined twice by the Court. *See* May 22, 2013 Op. & Order, ECF No. 132; June 26, 2013 Op. & Order, ECF No. 144. So there is no need to discuss the lengthy history a third time. Instead, only those facts essential to this opinion and order will be discussed.

GMSI manufactures graphite parts for use in producing semiconductors and LEDs.[2] As a part of the production process, GMSI sends its machined graphite parts to an outside company (in this case Mersen) so that the parts can be purified and coated with SiC. GMSI established that "Mersen, and its predecessor, have been purifying and coating GMSI's graphite parts for more than 17 years[.]" Def.'s Supp. Br. 3, ECF No. 150. Pursuant to the parties' relationship, "GMSI submitted work orders to Mersen with coating specifications, Mersen would send order acknowledgements to GMSI, coat and ship the products to GMSI, and then invoice GMSI for the coating."[3] Pl.'s Supp. Br. 1, ECF No. 146. The work orders from GMSI include an item number, quantity requests, specifications for coating thickness (SPEC/TOL), and a short description of the part to be purified and coated. *See* Work Order, *attached as* Pl.'s Supp. Br. Ex. 19. The same information, with the exception of thickness specifications, appears on Mersen's corresponding invoices. *See* Invoice, *attached as* Pl.'s Supp. Br. Ex. 20.

---

[2] Light-emitting diodes (semiconductor light sources).

[3] GMSI asserts that Mersen also shipped parts directly to GMSI customers.

At some point near the end of 2011, GMSI stopped paying Mersen's invoices, so Mersen filed suit. It asserts that GMSI breached the parties' agreements when it failed to pay 53 invoices that were issued between September 13, 2011 and December 1, 2011. GMSI responded with a counterclaim, asserting that Mersen is the party in breach due to its deficient performance.

In its complaint, Mersen asserted three claims: breach of contract, unjust enrichment, and account stated. GMSI's counterclaim contained four claims: breach of contract, unjust enrichment, implied warranty, and tortious interference. Each of these claims—save the breach of contract claims and Mersen's claim for an account stated—was dismissed on summary judgment. *See* May 22, 2013 Op. & Order 4–8, ECF No. 132. The parties were directed to file supplemental briefing on the breach of contract claims, which they have done. Mersen's contention that summary judgment is warranted on those claims will now be addressed.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

One additional point: because jurisdiction in this case is predicated upon diversity, Michigan law applies. As has long been established, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996).

### III

Mersen advances three arguments for why summary judgment is warranted on the breach of contract claims: (1) it fully complied with the agreements and GMSI breached when it failed to pay; (2) GMSI accepted and resold the products, and thus accepted Mersen's performance; and (3) GMSI will be unable to prove damages. Each issue will be addressed in turn.

### A

The first consideration turns on whether Mersen fully complied with the parties' agreements. GMSI contends that the work orders and invoices are supplemented by a course of dealing or, alternatively, trade usage. The Court concludes that there are genuine issues of fact concerning whether the parties' agreements were supplemented by trade usage, and consequently, whether Mersen complied with the terms of those agreements. Summary judgment is not warranted on this argument.

Michigan adopted the Uniform Commercial Code (UCC) effective January 1, 1964. *See Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 614 (Mich. 1992); Mich. Comp. Laws §§ 440.1101–440.9809. And although the UCC may not apply to this case directly (as the parties maintain their agreements dealt with services, not goods), it may nevertheless "be applied by analogy[.]" *UMIC Gov't Secs., Inc. v. Pioneer Mortg. Co.*, 707 F.2d 251, 253 (6th Cir. 1983).

Section 2202 of Michigan's commercial code establishes the following:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

> (a) by course of dealing or usage of trade (section 1205) or by course of performance (section 2208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Mich. Comp. Laws § 440.2202.[4] Noted by the Michigan Court of Appeals, the purpose of paragraph (a) in section 2202 is to make "admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached." *Michigan Bean Co. v. Senn*, 287 N.W.2d 257, 261 n.2 (Mich. Ct. App. 1979) (citation omitted). The admission of this evidence is based "on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used." *Id.*

Section 1303 defines "course of dealing" and "usage of trade" for purposes of Michigan's commercial code. According to that provision:

> (2) For purposes of this act, a "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

---

[4] This is the version of the Michigan statute that was in effect until July 1, 2013. On that date, an updated statutory provision took effect with modified language and internal references (substantively, both version of the statute are the same).

> (3) For purposes of this act, a "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question.

Mich. Comp. Laws § 440.1303. And although—under tried and true contract interpretation principles—a court "must interpret and enforce the contract as written" *In re Smith Trust*, 731 N.W.2d 810, 812 (Mich. Ct. App. 2007), even unambiguous contracts may be supplemented by "extrinsic evidence related to course of performance, course of dealing or usage of trade," *Senn*, 287 N.W.2d at 261 (citing *Campbell v. Hostetter Farms, Inc.*, 380 A.2d 463, 466 (Pa. Super. Ct. 1977)).

Here, GMSI asserts that the terms contained in the parties' work orders and invoices were supplemented by both a course of dealing and usage of trade. Specifically, GMSI argues that Mersen was obligated to "provide semi-conducting quality coating" which involves coating parts at a purity level of "5 parts per million." Def.'s Supp. Br. 4. GMSI also claims that Mersen was required to provide SiC coating "free of pits, pinholes, fibers, cracks, roughness, and other occlusions and defects[.]" *Id.* at 5. In addition, GMSI argues that "[c]ompliance with ISO standards was part of the contract[s]." *Id.* at 6.

But GMSI has not demonstrated a course of dealing between the parties that could lead to the conclusion that purity levels, visual defects, and compliance with ISO standards are a part of the parties' agreements. While GMSI adequately set forth the rule that a course of dealing *can* supplement a contractual agreement, *see id.* at 2–3, it has not produced evidence that Mersen's previous purification and coating standards created mutual course of dealing terms. GMSI does not allege that in the past Mersen always delivered coatings with purity levels of 5 ppm or less, and that the performance was pursuant to their agreements. GMSI has not demonstrated that Mersen always provided coatings free of visual pits or other defects, or that it always complied

with ISO standards because it agreed, in fact, to do so. Rather, GMSI only briefly mentions that Mersen's previous services were "for the most part without issue and under the terms set forth below." *Id*. at 3. But the mere fact that the parties were in business together for more than seventeen years, without more, does not shed light on their beliefs concerning their contractual commitments. GMSI has not demonstrated "a sequence of conduct concerning previous transactions between the parties . . . that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Mich. Comp. Laws § 440.1303(2). The legal principles addressing course of dealing do not apply.

GMSI's argument concerning usage of trade, on the other hand, is well-supported. GMSI engaged Witold Kowbel as an expert witness. Dr. Kowbel has a multidisciplinary Ph.D. in material science & engineering and chemistry, as well as "over 27 years of academic, government laboratory, and industry experience in CVD SiC coating[.]" Kowbel Aff. ¶¶ 3, 4, ECF No. 68. In his affidavit, Dr. Kowbel maintains that "Mersen was to provide purification and coating that resulted in purity levels less than 5 ppm. This is the level that is acceptable in the semiconducting, MOCVD, and epitaxial industry." *Id*. at ¶ 5.

One of Mersen's representatives, Brian Marquardt, confirmed that a purity level of 5 ppm is the industry standard for silicon epitaxy and MOCVD[5]:

> Q: Was the industry standard for purity level less than five parts per million?
>
> A: For which industry?
>
> Q: The industry that my client's parts were used in.
>
> A: For silicon epi the standard is 5 PPM or less. For MOCVD it's a work in progress I would say.
>
> \*      \*      \*

---

[5] Metalorganic vapour phase epitaxy.

> Q: Doesn't Mersen advertise on its website that its purity levels are less than five parts per million?
>
> A: I believe it does.

Marquardt Dep. 112–13, *attached as* Def.'s Mot. Ex. 2. And although he had previously distinguished the silicon epitaxy and MOCVD industries, Marquardt acknowledged that "the purification process for MOCVD and silicon epi is the same." *Id*. at 114.

So if Mersen and GMSI truly are in the silicon epitaxy and MOCVD industries (a point neither party seems to dispute), and the industry standard is purification at 5 ppm or less, then maybe Mersen did not fully perform. Because according to Dr. Kowbel, "all 608 parts purified and coated by Mersen for which Mersen seeks payment for in this litigation are defective because of Mersen's improper purification and coating." *Id*. at ¶ 12. Dr. Kowbel asserts that "Mersen did not provide purification and coating below 5 ppms on the parts that are the subject of this litigation." *Id*. ¶ 5. Usage of trade just may apply to supplement the parties' agreements.[6]

Mersen contests the application of trade usage to this case by emphasizing that GMSI has admitted that purification and dimensional specifications, along with lifetime requirements, "were not actually part of the agreements between the parties." Pl.'s Supp. Br. 4 (citation omitted). But Mersen's assertions are simply too hasty. When Mersen's citations are examined, it becomes clear that GMSI's president Peter Guercio did not testify that trade-usage specifications were not a part of the parties' agreements, only that any performance expectations were not "listed on a drawing." Guercio Dep. 104, *attached as* AOE Ex. 1, ECF No. 62.

---

[6] Under the UCC, a usage of trade "need not be ancient and immemorial, universal or the like." U.C.C. § 1-205 cmt. 5 (internal quotation marks omitted). Instead, it is sufficient if the "usages [are] currently observed by the great majority of decent dealers, even though dissidents ready to cut corners do not agree." *Id*. And although official comments to the UCC such as this one lack the force of law, they "are useful aids in construing and interpreting its sections." *Power Press Sales Co. v. MSI Battle Creek Stamping*, 604 N.W.2d 772, 776 (Mich. Ct. App. 1999) (citation omitted).

Instead, Guercio made clear those specifications would be ironed out during "a conversation. Primarily that's how a lot of this was done, via telephone or personal meetings." *Id.*

Mersen also claims to have proof that GMSI admitted "that the agreements did not require Mersen to purify the graphite parts to below 5 ppm." Pl.'s Supp. Br. 8. In support of this proposition, Mersen cites the following segment from GMSI's response to its motion for summary judgment: "In this case, the express contracts, the work orders and invoices do not explicitly mention many of the terms of the parties' contracts—notably the quality specifications for Mersen's services outside of thickness." Def.'s Resp. 19, ECF No. 66. Again, too hasty. For this is exactly GMSI's point: purity-level requirements were contemplated by the parties at the time of contracting, simply not memorialized in writing. This provision is not GMSI's concession that purity requirements are not a part of the parties' agreements. Rather, GMSI plainly asserts that "[t]he other terms of the parties' contract are established through the parties' course of dealing and usage of trade." Def.'s Supp. Br. 2, ECF No. 150 (citations omitted). So while the parties' agreements may not involve additional terms, there is little doubt GMSI has not conceded the point.

Although the Court concludes that GMSI has not demonstrated evidence sufficient to support a course of dealing, given the evidence it has presented, whether the parties' contracts are supplemented by "usages of trade" is properly left for a jury. *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880, 886 (Mich. 1980) ("juries were permitted to determine the duration of the contract from . . . usages of trade"); *see also Funk v. Gen. Motors Corp.*, 220 N.W.2d 641, 654 (Mich. 1974) *abrogated on other grounds by Hardy v. Monsanto Enviro-Chem Sys., Inc.*, 323 N.W.2d 270 (Mich. 1982) (jury was permitted to consider whether "usage of the trade" altered a party's obligations under an agreement). Importantly, however, GMSI bears the

burden of establishing the applicability of trade usage at trial. *See The Martha*, 53 U.S. 347, 357 (1851). It will be left for a jury to decide what the relevant industry standards are and whether those standards alter Mersen's obligations. And because there is a genuine dispute whether the parties' agreements are supplemented by usage of trade, there is a genuine dispute whether Mersen fully satisfied its obligations under those agreements. That, too, will be left to a jury.

**B**

Next, Mersen argues that summary judgment is warranted even if its coating and purification services were deficient because GMSI did not reject the parts in a timely manner. According to Mersen, "Michigan courts have long recognized that where the recipient of services or goods conducts himself in a manner inconsistent with rejection, rejection is waived." Pl.'s Supp. Br. 12 (citations omitted). While true in principal, the Court identifies a genuine dispute of material fact concerning this issue as well.

Again, Michigan's Uniform Commercial Code will guide the determination. It provides that acceptance occurs when the buyer:

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (b) fails to make an effective rejection (subsection (1) of section 2602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Mich. Comp. Laws § 440.2606(1). Section 2602, governing rejections, establishes that the "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Mich. Comp. Laws § 440.2602(1).

Generally, acceptance precludes rejection. *Dimmitt & Owens Fin., Inc. v. Motor Wheel Corp.*, No. 210292, 2000 WL 33423186, at *3 (Mich. Ct. App. Apr. 21, 2000).

Whether a party has accepted goods or services, acted inconsistently with rejection, or retained the goods without rejection for "a lapse of a reasonable time" are questions properly submitted to a jury. *See Rusk Mfg. Co. v. John D. Mershon Lumber Co.*, 253 N.W. 231, 232 (Mich. 1934) (affirming jury verdicts concerning those very questions). As the Michigan Supreme Court has established, "what is a reasonable time for inspecting and rejecting goods tendered in performance of a contract of sale is a question for the jury." *Stone v. Frohlich*, 133 N.W. 951, 952 (Mich. 1911); *see also Leonard Refineries v. Gregory*, 295 N.W. 215, 217 (Mich. 1940) ("The court erred in refusing to submit to the jury the question of reasonable time." (citation omitted)); *Penn. Rubber Co. v. Detroit Shipbuilding Co.*, 152 N.W. 1071, 1076 (Mich. 1915) ("We think it was a fair question for the jury whether by its conduct, defendant did not accept the tiling").

Also, GMSI merely taking possession of the goods does not equate acceptance, "for the UCC makes an important and just allowance of a 'reasonable opportunity' to inspect goods." *Colonial Dodge, Inc. v. Miller*, 322 N.W.2d 549, 551 (Mich. Ct. App. 1982) (quoting Mich. Comp. Laws §§ 440.2606(1)(a), (b)).[7]

In this case, GMSI has demonstrated that it "presented Mersen with a report illustrating the failures of Mersen's coating on or around November 6, 2011." Guercio Aff. ¶ 11, *attached as* Def.'s Reply Mot. Summ. J. Ex. 1–A, ECF No. 16. This report was delivered after GMSI came to believe Mersen's services did not conform to the parties' agreements, only two months after the first unpaid invoice Mersen issued. Additionally, according to GMSI's president

---

[7] Again, although the parties maintain their agreement concerned services rather than goods, the type of service involved here (purification of a graphite part and application of a chemical coating) makes the the UCC particularly compelling guidance.

(Guercio), "[a] GMSI employee also notified Mersen of its failed parts that would need to be replaced and were not acceptable on December 9, 2011." *Id.* at ¶ 13.  And, "Mersen was notified that its coating had failed on products that were returned to Mersen at their request on or around January 12, 2012 and February 6, 2012." *Id.* at ¶ 12.  Whether these notifications constitute rejection within a "reasonable time" should be decided by a jury, not this Court.

Moreover, the parties' course of dealing is once again implicated here.  A course of dealing can impact whether a party's conduct constitutes acceptance or rejection of goods or services.  *See M.C.W., Inc. v. Hamilton Mut. Ins. Co.*, No. 233480, 2003 WL 193567, at *6 (Mich. Ct. App. Jan. 28, 2003); *Power Press Sales Co. v. MSI Battle Creek Stamping*, 604 N.W.2d 772, 778–79 (Mich. Ct. App. 1999).  Indeed, "a protracted course of dealing between the parties" may be "indicative of what constitutes reasonable time [for acceptance], and what is so considered and treated by them."  *Dulany-Vernay Co. v. Kalamazoo Stationary Co.*, 181 N.W. 984, 985 (Mich. 1921).

GMSI has provided evidence that over the course of its relationship with Mersen, services were routinely "rejected" only after the parts were sold and delivered to GMSI's customers.  As late as March 2012, Mersen indicated that some parts which had been returned by GMSI's customers were its "responsibility."  Le Marquis Dep. 75, *attached as* Def.'s Supp. Br. Ex. 17.  Other evidence indicates Mersen frequently replaced or offered credits for parts that failed after purification and coating, even if they had been sold to customers.  According to Brian Marquardt, "if there was a part that performed less than what the expectations were we would coat two parts as a replacement for the one part that didn't perform."  Marquardt Dep. 104.  He continued, "[s]o we'd do two parts, purify and coat two parts" for which GMSI was not charged.  *Id.*  When Jeff Sprague took over Mersen's coating operations, he changed the two-for-one deal

to a system of credits. *Id*. at 105. Under the credit system, if one of GMSI's parts was returned by a customer after Mersen's services, Mersen would "credit the invoice" and simply "make the replacement[.]" *Id*. at 106. According to Marquardt, in the past, "issues relating to defective product supplied by Mersen" were always worked out through the system of credits. *Id*. at 107.

This was substantiated by Ron Gomez, another Mersen employee. He testified as follows:

> Q: Well, what about – what about customer complaints for product where Mersen decides not to issue a credit, where would that be reflected on that document?
>
> A: In my tenure with Mersen that has never happened, even – even when we questioned or knew it for a fact that, you know, it wouldn't be a problem – or it wasn't our problem, or we weren't sure, we would issue a credit as a good-will gesture to our customers, and we've done that in many cases with GMSI as well.
>
> Q: Okay. So you're not aware of any instances where a customer has complained about defects where Mersen did not issue a credit other than my client?
>
> A: That's – that's correct.

Gomez Dep. 54, *attached as* Def.'s Supp. Br. Ex. 17.

As this evidence demonstrates, it is possible that over the course of Mersen and GMSI's relationship, a "reasonable time" for inspection has come to include a preliminary period of use by the end customer. So whether the parties' course of dealing extended the reasonable time for rejection is another consideration for a jury.[8]

---

[8] Mersen contends that GMSI resold the parts, and thus acted inconsistently with any intention to reject them. Pl.'s Supp. Br. 13 (citing *Livingston Shirt Corp. v. Great Lakes Garment Mfg. Co.*, 88 N.W.2d 614 (Mich. 1958) and *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974 (N.D. Ill. 2002)). However, whether conduct evidences an intent to reject goods or services is a case-specific inquiry, which limits the applicability of the two cases Mersen relies on (where the goods involved—articles of clothing—were easily inspected without the possibility of latent defects). Additionally, the goods Mersen purified and coated were not owned by it, which further undermines the applicability of *Livingston* and *Fabrica*, where the sale of goods "even *after* a timely rejection" was "inconsistent with the *seller*'s continued ownership" of the goods, and therefore

## C

Finally, Mersen argues that no matter what, GMSI will not be able to prove damages beyond "mere speculation and conjecture," Pl.'s Supp. Br. 14, and thus summary judgment is warranted. Mersen is incorrect, and summary judgment will not be granted.

"The damages recoverable for breach of contract are those that arise naturally from the breach or those that were in contemplation of the parties at the time the contract was made." *Lawrence v. Will Darrah & Assoc., Inc.*, 516 N.W.2d 43, 44 (Mich. 1994) (brackets and citations omitted). Where a plaintiff seeks damages arising out of lost profits, it must "establish the damages with reasonable certainty and also show lost profits were within the contemplation of the parties at the time they entered the agreement." *Id*. at 46 n.8.

GMSI alleges it should recover, "at a minimum," the damages "for all of the defective coatings it has paid for, plus the cost of material and machining for those parts." Def.'s Supp. Br. 13. If GMSI is able to prove Mersen breached the parties' agreements, GMSI is correct—it certainly would be entitled to any payments it made to Mersen in exchange for defective parts, as well as its own costs to machine parts that Mersen allegedly ruined. Contrary to Mersen's contention, these types of damages are certainly not speculative, but capable of reliable calculation. *See* Def.'s Supp. Br. Ex. 24.

And while GMSI may have been paid by its customers for the parts Mersen produced, GMSI asserts that its contracts with its customers require it to offer—and that it will continue to offer—replacement parts or credits to those that received defective parts. GMSI claims that Mersen entered into the agreements knowing these facts. So while GMSI may have received payment, obviously it may not have been "made whole" if it is required by its customer contracts

---

precluded rejection. *Fabrica*, 218 F. Supp. 2d at 978 (first emphasis in original). GMSI's sale of its own goods would not infringe on Mersen's ownership rights.

to machine, purify, coat, and deliver replacement parts free of charge. *See Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 463 (Mich. Ct. App. 1989) ("the appropriate measure of damages for breach of a contract . . . is that which would place the injured party in as good a position as it would have been in had the promised performance been rendered.").

Finally, GMSI may even be entitled to lost profits—an exceptional remedy, although permissible if the evidence supports it. Marquardt testified that he was aware that GMSI had "a number of customers that Mersen coated parts for," numbering at least "[m]ore than five." Marquardt Dep. 29. Marquardt established that he was aware these customers used the coated parts for "MOCVD and silicon" applications. *Id*. at 30. Further, Marquardt testified that Mersen was aware of "how catastrophic it would be to GMSI if the parts Mersen coated were defective[.]" *Id*. at 31–32. It is therefore possible that Mersen knew, at the time of contracting, the damage GMSI would suffer (both in lost profits and damage to its reputation) if the parts it delivered to customers failed. Whether these damages were within the contemplation of the parties is, once again, a question of fact that must be decided by a jury. *See Barker v. Underwriters at Lloyd's, London*, 564 F. Supp. 352, 358 (E.D. Mich. 1983) (declining to grant summary judgment because "whether plaintiff can recover alleged consequential damages is a question of fact" that remained undecided). Because GMSI is not foreclosed from proving concrete damages here, and because at least lost profits are still possible,[9] summary judgment is inappropriate.

---

[9] GMSI also asserts it should be able to recover damages for "costs for re-qualification parts that must be provided free of charge" and "expedited costs to quickly establish a coating operation[.]" Def.'s Supp. Br. 15. The Court is certainly not convinced these damages should be available, but need not decide the question at this stage as there is a genuine dispute as to whether GMSI will be able to prove other forms of damages.

**D**

To summarize, the claims that remain are Mersen's claims for breach of contract and account stated,[10] and GMSI's claim for breach of contract. Short of settlement, trial will proceed with instructions to the jury something like this: Mersen will bear the burden of proving the existence of valid agreements between the parties, that it sufficiently performed under those agreements or that GMSI accepted its services after a "reasonable time" for inspection and rejection had passed, and its resulting damages for GMSI's breach.

GMSI will bear the burden of demonstrating that the parties' express agreements were intended to be supplemented by trade usage, and that Mersen did not perform as required by these additional terms. Next, GMSI must demonstrate by a preponderance of the evidence that it rejected Mersen's services—that is, did not accept them—and seasonably notified Mersen of the rejection. What constituted a "reasonable time" for inspection and rejection under the parties' agreements may be affected by the parties' course of dealing; and that is also GMSI's burden to establish. Further, if applicable, GMSI must also demonstrate that Mersen failed to cure within the time of performance under the agreements, and also failed to provide "seasonable notice" of an intention to replace any defective parts.[11] Finally, GMSI will bear the burden of proving its damages in a manner more compelling than "mere speculation and conjecture."

**E**

One final issue requires attention. The parties have filed a stipulation to adjourn the case management dates governing these proceedings. They indicate that because they "are unsure of

---

[10] However, as the Court emphasized in its original opinion and order, there is serious doubt concerning the possible success of Mersen's claim for an account stated. *See* May 22, 2013 Op. & Order 4 n.4.

[11] The Court acknowledges that the concepts of cure and replacement are grounded in the UCC, *see* Mich. Comp. Laws § 440.2508, but is not entirely convinced that those concepts should not apply here. Because the parties have offered nothing concerning the issue in their briefs, it shall remain—for now.

when the hearing on Mersen's Motion for Summary Judgment will be rescheduled, and given this Court's busy schedule, it seems likely that the Motion for Summary Judgment will remain pending at the time of the scheduled pretrial conference." The parties correctly point out that the final pretrial conference is set for August 29, 2013 and trial will commence on September 17, 2013. But as this opinion makes clear, Mersen's motion will not foreclose proceeding as scheduled. The Court sees no other reason to adjourn these dates.

The parties will be given additional time to file expert-witness lists and motions *in limine* (currently due July 17 and August 2, 2013, respectively)—but not much. Pretrial disclosures will be due on August 2, 2013.[12] Motions *in limine* will be due on August 16, 2013. As is typical, the parties' joint final pretrial order and jury instructions will be due one week before the final pretrial conference. *See* Case Mgmt. & Sched. Order, ECF No. 8. Here, that is August 22, 2013.

In addition, the Court will emphasize that its schedule is tight. It anticipates no more than five or six days of trial, and expects counsel will confer to identify each of the witnesses they plan to call (as well as the necessary time for direct and cross examination). This information should all be contained in the parties' joint final pretrial order.

## IV

Accordingly, it is **ORDERED** that Mersen's motion for summary judgment, ECF No. 60, is **DENIED** as it relates to the parties' breach of contract claims.

It is further **ORDERED** that pretrial disclosures in the form required by Federal Rule of Civil Procedure 26(a)(3)(A) and (B) are due on or before **August 2, 2013**.

It is further **ORDERED** that motions *in limine* must be filed by **August 16, 2013**.

---

[12] The Court recognizes that the parties have already filed these pretrial disclosures. *See* ECF Nos. 153 and 154. Should the parties wish, they may supplement their disclosures until August 2, 2013.

- 18 -

It is further **ORDERED** that the joint final pretrial order and jury instructions are due by **August 22, 2013**. The final pretrial conference and trial will take place as scheduled.

| | |
|---|---|
| Dated: July 26, 2013 | s/Thomas L. Ludington<br>THOMAS L. LUDINGTON<br>United States District Judge |

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 26, 2013.

                s/Tracy A. Jacobs
                TRACY A. JACOBS

---